### Decatur Cereal Mill Co. v. John Boland.

1. EXPLOSIVES—*Care Required in the use of.*—Persons and corporations using dangerous and explosive chemicals in experimental processes are charged with the highest degree of care to prevent accident and injury to others. The law imposes upon them the employment of all reasonable safeguards against danger from explosions.

Trespass on the Case, for personal injuries. Appeal from the Circuit Court of Macon County; the Hon. EDWARD P. VAIL, Judge, presiding. Heard in this court at the November term, 1900. Affirmed. Opinion filed June 10, 1901.

W. C. JOHNS, attorney for appellant.

MILLS BROTHERS, attorneys for appellee.

MR. PRESIDING JUSTICE HARKER delivered the opinion of the court.

Appellant is a corporation operating a mill and a grain elevator. In connection with its mill, it had erected certain machinery and appliances for making experiments in extracting oil from corn germs. In the experimental processes adopted, it used bi-sulphide of carbon, a fluid which, when exposed to the atmosphere, generated a highly explosive gas. The fluid was stored in a wrought iron tank, on top of a small, tall structure, close to the mill building, designated by witnesses as the "dog house." In the "dog house" was a machine having buckets attached to a revolving belt which received the corn germs from the mill and deposited them in a large iron pipe leading into another house, some seventy feet away, called the "oil house." The bi-sulphide of carbon was conveyed to the pipes leading from the "dog house" by an inch pipe in which was a valve with a circular wheel or handle for turning it. The turning of this small wheel in one direction permitted the flow of the fluid into the conveyor pipe, and turning it in the opposite direction stopped the flow and retained the fluid in the tank. The oil house contained a large galvanized iron arrangement, which had inside a contrivance for handling the materials used in the experiments, and was called the "dryer." Into it came from the dog house, two large iron pipes, one conveying the material from the dog house, and the other conveying it back to the mill after it had passed through various operations in the oil house. Inside the oil house were various air tight tanks, a pump operated by steam and a steam coil or heating apparatus. The steam to operate the pump, heat the coil and supply the dryer came by underground pipe from boilers in the engine house.

When the machinery was in operation, the bi-sulphide, as it flowed from the tank above the dog house through the valve mentioned, became mixed with the corn germs on the trip from the dog house to the dryer in the oil house by means of a cork-screw device which revolved in the con-

veyor pipe. When the corn germs and bi-sulphide·thus mixed, reached the dryer, the steam heat which was injected into the dryer, volatilized the bi-sulphide, dried the corn germs and enabled the oil to be extracted from them. The gas generated was conveyed into an iron tank in the oil house where it condensed again into bi-sulphide and was pumped back into the tank over the dog house.

To the safe and successful operation of such process, it was necessary that the tanks, pipes, etc., be air and water tight.

Appellee is a tinner by trade, employed by the Decatur Cornice Works. He was engaged to make some pipe connections and do some soldering in the oil house. After he had worked there some three days and finished that job, he was sent by appellant's foreman to the dog house to do a small job of soldering. Shortly after he began work in the dog house, it was discovered by men working in the oil house, that bi-sulphide was escaping from a hole in the bottom of the conveyor pipe and running upon the floor. The machinery was not then in operation. One of the men ran to the dog house and there found that the valve in the pipe from the bi-sulphide tank was partly turned. He at once shut off the liquid by turning back the valve. When appellee finished his job in the dog house a few moments afterward, he returned to the oil house to get his coat and some tools he had left there. The gas which was generated by the escaping bi-sulphide coming in contact with the air had in the meantime settled and accumulated about the floor, and a moment after appellee entered the room, a terrific explosion occurred, in which he and others were badly burned and injured. In a suit for damages, he recovered against appellant a judgment for $700.

It is contended that appellee's injury is not attributable to any negligence or want of care on the part of appellant, but was caused entirely by his own acts and want of care. It is contended, in the first place, that he turned the valve which permitted the flow of the bi-sulphide liquid to escape from its tank and made possible the explosion. It

is further contended that the immediate cause of the explosion was the lighted fire-pot which he carried from the dog house when he returned for his coat and tools.

It can not be determined from the evidence how the valve in question became turned. Appellee denies that he turned it, and testified that he had no knowledge of its existence until it was turned off by the employe mentioned. When he began working in the dog house he found another workman, one Bond, engaged there. Within a few moments after Bond left the fluid was discovered flowing from the conveyor pipe in the oil house. One of appellant's employes testified that appellee told him, after the explosion, that he turned the valve. Appellee denied making any such statement. We can not say that the jury were unwarranted in believing appellee on that point.

As to the contention that the explosion was caused by the lighted fire-pot which appellee brought from the dog house, appellee testified that before going into the oil house he placed his fire-pot south of the driveway, twenty feet or more from the oil house. He is corroborated on that point by another witness who saw the fire-pot at the place fixed by appellee immediately after the explosion. Even if it be conceded that he did carry the fire-pot into the oil house, and that it was the immediate cause of the explosion, that act alone was not sufficient to defeat a recovery. For two or three days he had been working in the oil house using his fire-pot without objection or warning that it was dangerous. He was ignorant of the explosive quality of bi-sulphide gas, and had no knowledge of the amount of the fluid that had escaped upon the floor of the oil house when he went there. We think the jury were entirely justified in finding that appellee was in the exercise of ordinary care for his own safety.

Persons and corporations using dangerous and explosive chemicals in experimental processes are charged with the highest degree of care to prevent accident and injury to others. The law imposes upon them the employment of all reasonable safeguards against danger from explosion. Not only should the machinery be safe, but all persons engaged

in working about it should be informed of the dangerous character of the appliances and material used.

The original cause of the explosion in this case was the opening of the valve in the dog house. If the valve was opened by some one accidentally coming in contact with it, which, in our opinion, is the most plausible theory, there is foundation for the contention that it was not properly placed or was in defective condition. The primary cause of the explosion was the bi-sulphide gas coming in contact with heat. The heat came from appellee's lighted fire-pot or from the steam pipes which supplied the dryer, and, in view of appellee's testimony as to where he left the fire-pot before he entered the oil house, and its corroboration, we are inclined to the opinion that it came from the latter. The pipe which conveyed the steam from the boiler room entered the oil house in a pit where the gas, after being generated, would be the most dense. The testimony shows that there was at the time a pressure on the boiler of nearly a hundred pounds—more than sufficient to create a temperature to explode the gas.

The experiments were carried on chiefly in secret, and while appellant's immediate employes were apprised of the dangerous character of the appliances and materials used, appellee testified that he was set to work without any such knowledge or without any warning of the surrounding dangers. A careful review of all the facts disclosed by the evidence in the record leads us to the conclusion that appellant did not employ the safeguards which the law imposed upon it, and that by reason thereof, appellee met his injury. The judgment will, therefore, be affirmed.